IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| WILLIAM J. NORDHOLM,<br><br>Plaintiff,<br><br>vs.<br><br>TIM BARKELL, et al.,<br><br>Defendants. | Cause No. CV 17-11-BU-JCL<br><br>ORDER |

Trial of this case is set for April 22, 2019. Currently pending are Plaintiff's motion for partial summary judgment on Count 1 of his amended complaint and Defendants' motion for summary judgment on all claims.

## I. Summary Judgment Standards

A party is entitled to summary judgment if it shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The party seeking summary judgment bears the initial burden of proving, on both the facts and the law, that it is entitled to judgment in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to "set forth specific facts showing that

there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At this stage of the proceedings, the judge does not weigh the evidence or determine the truth of matters at issue but only determines whether there is a genuine issue of fact to be tried. Only disputes over facts that might affect the outcome of the suit under the governing law are material; irrelevant or unnecessary disputes are not considered. If the documentary evidence permits only one conclusion, or if evidence submitted in opposition is merely colorable or not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 248–50.

## II. Analysis

### A. Count 1

Nordholm's first claim for relief alleges that Defendants Anaconda-Deer Lodge County ("ADLC") and Tim Barkell, the police chief, "have a policy and custom of charging booking fees and bonding fees" which "deprive[d] me of my money without notice or hearing." Am. Compl. (Doc. 9) at 5. He claims this deprivation occurred on three occasions when he was arrested and released: December 20, 2015, to January 7, 2015; February 27 to February 29, 2016; and March 4 to March 16, 2016. Nordholm also claims the Defendants impose the fees inconsistently. *See id.*

### 1. Undisputed Facts

The parties agree Nordholm was assessed a $25 booking fee on each of three arrests and a $70 bonding fee[1] when he was released from custody, resulting in total fees of $285. *See, e.g.*, Nordholm Decl. (Doc. 67-1) at 2–3 ¶¶ 3–10.

Defendants say, "On December 20, 2015, William Nordholm was charged a booking fee of $25.00 associated with his arrest on that date, of which he paid $23.00." Defs. Statement of Undisputed Facts ("SUF") (Doc. 64) at 3 ¶ 7. Nordholm basically agrees, but he puts it differently. He says, "Without notice or hearing, ADLC's jail took my $23 and converted it to the County's use." Nordholm Decl. (Doc. 67-1) at 2 ¶ 5. The parties agree he (or a bonding company) paid the "outstanding $2 booking fee from 12-20-15," as well as $70 in bonding fees, when he was released on January 7, 2016. *See* Defs. Statement of Disputed Facts (Doc. 69) ("SDF") at 2 ¶ 4; Nordholm Decl. (Doc. 67-1) at 2 ¶ 6.

Nordholm was again arrested on February 27, 2016, taken to jail, and charged a $25 booking fee. On that occasion, he "did not arrive with any cash for them to take." He paid the booking and bonding fees when he was released on February 29, 2016. The same facts occurred when Nordholm was arrested on March 4 and released on March 16, 2016. *See, e.g.*, Nordholm Decl. (Doc. 67-1) at

---

[1] Defendants explain that this fee consists of a $20 fee charged to the inmate and a $50 fee charged to the bail bond company. *See* Sather Aff. (Doc. 64) at 2 ¶ 4. For present purposes, the Court will assume the bail bond company passed these costs on to Nordholm.

3

2–3 ¶¶ 7–10.

When Nordholm was booked into the ADLC jail in October 2016, he was not charged a booking fee. *See id.* at 4 ¶ 18. Because he entered the jail to begin serving a sentence, he did not bond out and did not incur a bonding fee. *See* Defs. SUF at 5 ¶¶ 15–16.

### 2. The Fees and What Nordholm Claims About Them

By resolution, the ADLC county commissioners authorized the sheriff to impose booking and bonding fees. Fees are authorized for other things, too, for example, producing an affidavit ($50), serving a summons ($50), serving a writ of execution ($50 per account), or holding or rescheduling a sheriff's sale ($150 or $50, respectively). The fees are intended to "offset operational costs of the Law Enforcement Department" and "to recover the costs of services provided by the Anaconda-Deer Lodge County Law Enforcement Department." *See* Sather Aff. Ex. A (Doc. 64-1 at 2) ("Resolution No. 11-07").

Intuitively, "[b]eing arrested is not a 'service' to the person arrested!" *Markadonatos v. Village of Woodridge*, 760 F.3d 545, 551 (7th Cir. 2014) (en banc) (per curiam) (Posner, J., concurring in the judgment). But the Fourth Amendment says persons suspected of crimes may be arrested on probable cause, and the Fourteenth Amendment says arrestees must be protected from undue risks to their persons and health. At booking, an arrestee is identified so as not to get

4

"lost" or be confused with others who have perhaps done worse things. He is placed in a safe location, may request and obtain medical attention, may call a friend or family member or lawyer, and receives jail-issue clothing and maybe a shower for sanitary reasons. Doing these things is far more beneficial to the arrestee and to other inmates than not doing them, whether the arrest is justified or not. Many people do not "choose" to incur a need to serve summonses or subpoenas or to obtain copies of police reports, but, like booking, such services may prevent or ameliorate harms caused by others.[2] And fees for these services, provided they are fairly indexed with actual costs, reasonably require consumers of the services to pay a little above and beyond the taxes everyone pays for law and order.

Still, booking and bonding fees are different from the other listed fees, because they allow a law enforcement officer to generate the need for further law enforcement services. If fees exceed costs, an unscrupulous officer or county might redress temporary shortfalls in county funds by decreeing a flurry of arrests, and that may lead to arrests not supported by probable cause.

That is the real rub of the booking and bonding fees: the problem of an

---

[2] Judge Posner distinguishes between a booking fee and a bonding fee on the grounds that "[t]o be released on bail, whether having been arrested falsely or not, is a benefit that the Village of Woodridge confers on the people whom its police officers arrest." *Markadonatos*, 760 F.3d at 546. But surely the same can be said about booking: to be identified and protected is a benefit conferred on people arrested, whether they are falsely arrested or not.

*unjustified* arrest. Why should someone have to pay booking and bonding fees to an entity whose officers never should have arrested him in the first place?

Defendants seek summary judgment by arguing that Nordholm was not entitled to a hearing under *Mathews v. Eldridge*, 424 U.S. 319 (1976). "[T]o determine whether a pre-deprivation hearing is required and what specific procedures must be employed at that hearing," *Mathews* "balances three factors: (1) the private interest affected; (2) the risk of erroneous deprivation through the procedures used, and the value of additional safeguards; and (3) the government's interest, including the burdens of additional procedural requirements." *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015). As to a person who challenges the legitimacy of an arrest, these factors may favor a hearing.

But Nordholm is not in a position to make that claim. He does not claim that ADLC may not impose booking or bonding fees at all. He does not claim the fees are punitive in nature. He alleges only that he was deprived of his money "without notice or hearing." Am. Compl. (Doc. 9) at 5. Thus, the only question is whether Nordholm was entitled to individualized notice of the booking and bonding fees and to a hearing at which someone would decide whether he should pay them.

### 3. Notice

As to notice, the fee schedule was enacted by ADLC county commissioners. *See* Sather Aff. Ex. A (Doc. 64-1 at 2) (Resolution No. 11-07 (Feb. 1, 2011)). It is

6

"legislative in nature," and generally, "due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law." *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 969 (9th Cir. 2003) (quoting *Halverson v. Skagit County*, 42 F.3d 1257, 1260 (9th Cir. 1995)).

If the fees were so high as to be confiscatory, or were grossly disproportionate to the services provided, or if harsh consequences were imposed on nonpayment, or if a fee was seemingly directed at a few specific individuals, then the notice might be inadequate and the fee itself might be objectionable. *See, e.g.*, *Lambert v. California*, 355 U.S. 225 (1957) (holding that defendant was entitled to actual notice of registration requirement where failure to register was punishable as a felony). There is no indication of that here. Montana law requires that county commissioners' meetings and decisions be publicly accessible, *see, e.g.*, Mont. Code Ann. §§ 7-5-2122, -2123, -2125, -2129, -2131, and Nordholm has neither alleged nor shown that the legislative process that led to the fee schedule departed from the norms. "[G]eneral notice as provided by law [was] sufficient." *Halverson*, 42 F.3d at 1261.

### 4. Hearing

As to a hearing, Nordholm has never identified a legal or equitable defense to the fees. He does not explain what he would have said at a hearing. He does not claim his cash was taken clandestinely or against his will on December 20, 2015,

7

or that he did not turn it over in partial payment of the booking fee. He does not allege he was arrested without probable cause. He does not allege he was held in custody on unfounded charges. He does not allege he had to spend additional time in custody because he was unable to pay either the booking or the bonding fee.

"[T]he Constitution does not protect procedure for procedure's sake. . . . Unless a person asserts some basis for contesting a governmental deprivation of . . . property, he is not injured by defective procedures he has no occasion to invoke." *Rector v. City and County of Denver*, 348 F.3d 935, 943–44 (10th Cir. 2003). Even under Nordholm's "own reckoning of the facts, the hearing would not have vindicated any rights" and "[t]here was nothing for the hearing to accomplish." *Id*. at 944.

*Rector* distinguished two procedural due process cases the Supreme Court decided a year apart. In *Carey v. Piphus*, 435 U.S. 247 (1978), the plaintiffs "denied the substance of the underlying allegations" that led to their suspension from school without a hearing. The district court dismissed the complaint because it found the underlying allegations were true and a hearing would not have made a difference. The Supreme Court reversed, holding that the plaintiffs were entitled to nominal damages because they disputed the allegations and so were entitled to a hearing before they were suspended, "even if . . . the suspensions were fully justified under the school's rules and policies." *Rector*, 348 F.3d at 944 (citing

*Carey*, 435 U.S. at 266).

By contrast, in *Codd v. Velger*, 429 U.S. 624 (1977) (per curiam), the plaintiff argued he should have had a hearing before damaging information was placed in his personnel file, but he "did not challenge the substantial truth of the damaging material." *Rector*, 348 F.3d at 944. The Court held the plaintiff was not entitled to a hearing because "there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the underlying deprivation." *Codd*, 429 U.S. at 627, *quoted in Rector*, 348 F.3d at 944 (internal brackets omitted). Similarly, in *Rector*, the plaintiffs admitted they had parked illegally and did not claim they wanted to challenge their tickets, so the court dismissed their claims that the tickets' deceptive warnings about late fees unfairly pressured them to forego challenging the tickets. *See Rector*, 348 F.3d at 942, 945.

Nordholm does not contest anything about the booking or bonding fees or about his arrest. He claims nothing but a right to a hearing. A right to a hearing would arise *because* there is "some factual dispute" that has "some significant bearing" on an arrestee's liability for the fees. Nordholm's case is like *Codd* and *Rector* rather than *Carey*. He was not entitled to have a hearing merely for the sake of having a hearing.

### 5. Inconsistency in Charging the Booking Fee

9

Finally, Nordholm contends the booking fee, at least, is imposed inconsistently. Having considered all of Nordholm's submissions, the Court can only conclude he has not made out any case regarding alleged "inconsistency" in imposing the fees. He says he was booked into jail on October 26, 2016, but was not charged a fee. *See* Nordholm Decl. (Doc. 67-1) at 4 ¶ 18. He does not explain why he was not charged a fee on that occasion, or why he thinks it was not charged, or why not incurring a charge was significant. He does not contend the fee is imposed or not imposed on some impermissible basis, such as the race or gender of the person arrested, or a chummy relationship between the arrestee and the booking officer. Maybe the county's costs are covered by the State when someone enters jail to serve a sentence, or maybe the fee does not apply when the person has already been booked on the charge they come in on, or maybe the booking officer just forgot. Regardless, no genuine legal issue is presented, and no material fact requires trial.

### 6. Conclusion

There are no outstanding material questions of fact. Defendants are entitled to summary judgment on Count 1. There is no need to consider their argument concerning exhaustion of administrative remedies.

### B. Count 2

Nordholm's second claim alleges that Richard Pasha, a police officer, and

10

John Doe, a detention officer, conspired against him to file a false criminal complaint alleging criminal mischief in connection with damage to a mattress at the detention center. Nordholm claims the conspiracy occurred on or about February 28, 2016. The charge was dismissed on April 18, 2017. *See* Am. Compl. at 10. No material facts are disputed.

Defendants assert they had probable cause to believe Nordholm damaged the mattress. Probable cause is not established by one officer's report of another officer's conclusory statement that Nordholm damaged a mattress. That is all Defendants have shown. A mere accusation does not set forth any "facts or circumstances" warranting a "prudent" inference that either the statement or the report of it is accurate. *See Hart v. Parks*, 450 F.3d 1059, 1065–66 (9th Cir. 2006), *cited* in Defs. Br. in Supp. (Doc. 61) at 17–18.

Even so, to prevail on Count 2, Defendants need only refute Nordholm's claim of false statements and conspiracy. They do so by pointing to a lack of evidence showing a conspiracy to lie. To oppose the motion, Nordholm must at minimum produce evidence someone lied. The evidence he points to, however, is not significantly probative. *See Anderson*, 477 U.S. at 248–50.

Nordholm refers to Detention Center Manual § 15.10.07, which states that "[s]tandard bedding will be issued and a receipt obtained from the detainee," Nordholm Decl. Ex. A (Doc. 71-2 at 8), but he does not claim he provided a

11

receipt saying the mattress was damaged. He also points out that Officer Durkin destroyed the mattress without documenting where the mattress was or what condition it was in before it wound up in Nordholm's cell or after the officer discovered the supposed damage. If he also pointed to evidence that photographs are routinely taken when jail property is destroyed or that the placement and condition of inmates' mattresses is routinely tracked and inventoried, Officer Durkin's contrary action on this occasion might have some significance. But Nordholm has not pointed to any evidence that is more consistent with conspiracy or falsehood than with carelessness or mistake.

Lack of evidence to support the officers' allegations led to dismissal of the criminal complaint. *See, e.g.*, Nordholm Decl. Ex. G (Doc. 71-7 at 1) (purporting to be letter from deputy county attorney stating that "the Detention Supervisor stated the damage to the mattress may have been there prior to Mr. Nordholm's stay."). That same lack of evidence does not support Nordholm's claim that one or both officers lied. Defendants are entitled to summary judgment in their favor on Count 2.

### C. Count 3

Nordholm's third and final claim alleges that Defendants Barkell, Sather, Durkin, and Staley conspired to retaliate against him for filing a lawsuit or otherwise troubling officers. A retaliation claim contains five elements: "(1) An

receipt saying the mattress was damaged. He also points out that Officer Durkin destroyed the mattress without documenting where the mattress was or what condition it was in before it wound up in Nordholm's cell or after the officer discovered the supposed damage. If he also pointed to evidence that photographs are routinely taken when jail property is destroyed or that the placement and condition of inmates' mattresses is routinely tracked and inventoried, Officer Durkin's contrary action on this occasion might have some significance. But Nordholm has not pointed to any evidence that is more consistent with conspiracy or falsehood than with carelessness or mistake.

Lack of evidence to support the officers' allegations led to dismissal of the criminal complaint. *See, e.g.*, Nordholm Decl. Ex. G (Doc. 71-7 at 1) (purporting to be letter from deputy county attorney stating that "the Detention Supervisor stated the damage to the mattress may have been there prior to Mr. Nordholm's stay."). That same lack of evidence does not support Nordholm's claim that one or both officers lied. Defendants are entitled to summary judgment in their favor on Count 2.

### C. Count 3

Nordholm's third and final claim alleges that Defendants Barkell, Sather, Durkin, and Staley conspired to retaliate against him for filing a lawsuit or otherwise troubling officers. A retaliation claim contains five elements: "(1) An

assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

No material facts are disputed. The Court assumes Nordholm's allegations are true.

### 1. Service of Process

Nordholm alleges that Defendants Barkell and Durkin evaded Nordholm's attempt to have a fellow inmate serve process on Barkell in connection with a separate lawsuit filed in state court. Barkell later asserted insufficient service of process as a defense to that suit. *See* Nordholm Decl. (Doc. 71-1) at 6–8 ¶¶ 23–26. This Court perceives no claim for relief that could arise on these alleged facts. The First Amendment does not require public officials to accept service of process.

### 2. Destruction of Dental Services Request

Nordholm contends that, on December 31, 2016, he submitted a "kite" to Defendant Staley requesting dental services. When he had not heard anything about it, he asked Vera Hoshied, a jail staff member, to look for it. She did not find it and gave Nordholm another request form, "entirely different from the one given to me by Staley on December 31, 2016." Nordholm Decl. (Doc. 71-1) at 9 ¶

31. Nordholm also asked Defendant Staley to look for the original kite. On January 28, 2017, Nordholm asked Staley whether he had located it. Staley responded "no," "with a sneer," and said that "since it came from [Nordholm] . . . it probably made its way to the paper shredder like the rest." *See id.* at 9–10 ¶¶ 32–33.

Defendant Staley's actions and statements would not deter a person of ordinary firmness from submitting kites or grievances.

### 3. Failure to Provide Forms and Copies and Forward a Letter

Between February 28, 2016, and January 22, 2017, Nordholm submitted more than 20 grievances and also sent letters to state and federal officials about the conditions at the detention center. Nordholm contends that Defendant Sather responded to only two of his grievances. On January 25, 2017, Nordholm asked Defendant Durkin to make copies of the December 31 dental kite and a grievance. In response, Durkin removed Nordholm from his pod into the hallway and told him that Defendants Sather and Barkell had said, "No more copies for Nordholm." When Nordholm asked whether his lawsuit against Barkell was the reason, Durkin told him the lawsuit was "not all the trouble you cause" and refused to provide any more grievances or copies. *See* Am. Compl. at 10–12.

On February 1, 2017, Nordholm was transported from ADLC to the jail in Powell County in connection with the execution of his sentence. *See* Nordholm

14

Decl. (Doc. 71-7) at 10 ¶ 34; Defs. SUF (Doc. 62) at 3 ¶ 7; Sather Aff. (Doc. 64) at 5 ¶ 16. Nordholm did not receive a letter sent by the Montana Judicial Standards Commission to his ADLC address, but he obtained from the Commission a copy of that letter. *See* Nordholm Decl. at 10–11 ¶ 35.

Taking all these allegations as true, Nordholm shows that Defendants did not respond to his grievances in a responsible or consistent fashion, refused to give him additional forms or copies of documents for about a week before he left ADLC, and failed to forward a letter to him. But lack of cooperation or response to grievances would not deter a "person of ordinary firmness" from filing grievances in the first place. The facts Nordholm describes are not remotely comparable to the real consequences imposed on Jones, a Muslim inmate who complained about having to handle pork in his assigned kitchen job, *see Jones v. Williams*, 791 F.3d 1023, 1029, 1035–36 (9th Cir. 2015), or the humiliation and confiscation or destruction of property suffered by Rhodes when he complained about damage to his typewriter, *see Rhodes*, 408 F.3d at 563–65, or any of the consequences Watison suffered, whether it was having a gun cocked and pointed at him, being threatened with a punch in the mouth, or being deprived of breakfast, *see Watison v. Carter*, 668 F.3d 1108, 1115–17 (9th Cir. 2012).

### 4. Conclusion: Count 3

Defendants are entitled to summary judgment on Count 3.

Based on the foregoing, the Court enters the following:

**ORDER**

1. Plaintiff's motion for partial summary judgment (Doc. 66) is DENIED.

2. Defendants' motion for summary judgment (Doc. 60) is GRANTED on all counts.

3. Defendants' motion for leave to allow use of personal electronics (Doc. 81) is DENIED AS MOOT.

4. The amended complaint (Doc. 9) is DISMISSED WITH PREJUDICE.

5. All pretrial and trial deadlines are VACATED. The transport order and writ of habeas corpus issued on March 13, 2019, are VACATED and DISMISSED.

6. The clerk shall enter judgment, by separate document, in favor of Defendants and against Plaintiff.

DATED this 4th day of April, 2019.

      */s/ Jeremiah C. Lynch*
      Jeremiah C. Lynch
      United States Magistrate Judge

cc: USMS